LEVAL & COMPANY, INC. *v.* CAVER.

No. 39366          December 6, 1954          76 So. 2d 231

*J. S. Finch,* Booneville, for appellant.

*Donald Franks,* Booneville, for appellee.

ROBERDS, P. J.

Leval & Company, Inc., appellant, sued Caver, appellee, in the Circuit Court of Prentiss County, Mississippi, upon a promissory note executed by Caver to Leval, dated February 10, 1951, in the principal sum of $720.00, bearing interest 'at six percentum per annum and obligating the maker to pay a reasonable attorney's fee should the note be placed in the hands of an attorney for collection.

Caver, as his only defense, pled lack of consideration for execution of the note. A jury found for Caver. Leval requested, but was denied, a peremptory instruc-

tion. Leval says he was entitled to that in the lower court and is entitled to it here. Caver says the verdict of the jury was authorized. Those are the issues. A recital of the dealings between these parties, stated in chronological order, will aid in the solution of the questions.

Leval & Company was a corporation domiciled at Kansas City, Missouri, and a large exporter of soybeans. Caver was a resident citizen of Prentiss County, engaged in the business of buying and reselling soybeans under the name of "Caver Brothers Seed Company," with places of business at Booneville and Baldwyn, Mississippi.

On July 31, 1950, these parties entered into a written agreement, under which Caver sold to Leval and Leval purchased from Caver three railroad car loads of soybeans, to consist of approximately 5,000 bushels, at a price of $2.28¼ per bushel free on board cars at Booneville, deliveries to be made during October and November 1950, on dates suitable to Caver, the shipments to be made to Public Grain Elevator, New Orleans, for credit of Leval.

Caver shipped two cars of beans under this contract — one on October 20th consisting of 123,000 pounds, and the other on October 23rd, consisting of 95,000 pounds. These shipments aggregated 3,666⅔ bushels of soybeans.

About October 23, 1950, or the "last" of October, as testified by Caver, he called the Standard Commission Company of Memphis over the telephone and notified that concern he would not ship any more beans to Leval; that he was not able to purchase the beans. Caver now says this was a notice to Leval that he, Caver, had breached his contract and that Leval was then under duty to go into the market and purchase other beans to fulfill the Caver contract and he, Caver, would be liable only for the loss sustained by Leval after he had done that, and that there would have been no loss; therefore,

there is no liability under the note sued on under the circumstances hereinafter disclosed. We shall discuss this later.

Leval, after this supposed notice to the Commission Company, of which Leval had no knowledge, insisted that Caver fulfill his contract. Caver asked for further time.

On November 30, 1950, Leval telegraphed Caver as follows: "Referring contract soybeans still unshipped. We hereby grant you extension shipment by fifteenth of December."

On December 16, 1950, Caver wrote Leval this letter: "Dear Sir:

"This is regard to 1 car of soybeans that we are unable to deliver.

"At this time it is impossible, I regret to say, to get the amount of this cleared up as our money is tied up elsewhere and will get the thing taken care of as soon as possible.

"I am wondering if it would be possible to get this taken care of by paying $100.00 a month?

"With deepest regrets,

(s) William L. Caver, Jr.

William L. Caver, Jr.,

Caver Bros. Seed Company"

On February 10, 1951, Mr. John A. Morrison, attorney for Leval, came to Booneville and conferred with Mr. Caver. It appears that by this time the price of soybeans had advanced considerably in price. Mr. Morrison testified that Mr. Caver could not, or would not, fulfill the contract by shipping to Leval the remainder of the beans. They were confronted with the problem of adjusting the controversy. He said they did that by taking as a basis for settlement the quantity of beans to be shipped according to the contract, to-wit, 5,000 bushels, and deducting the amount which had been shipped, i. e. 3,666⅔ bushels; that as to the price they deducted the price agreed to be paid in the contract from the market

price prevailing on the date of the conference and divided the difference by half — in other words, they "split" the difference, as he said — and arrived at the amount of the note in this manner. Caver did not deny any of this. Caver then executed the note in question in settlement of the controversy. It should be stated that, as an accommodation to Caver, the note was payable in installments, the first installment of $100.00 being due October 31, 1951, and the last, in the amount of $160.00, being due December 31, 1952.

Caver paid nothing on the note, and on November 29, 1951, Leval telephoned Caver about the matter. On December 4, 1951, Caver wrote Leval in response to that conversation, asking Leval not to sue on the note, saying he had tried to borrow the money with which to pay the note. He said he had lost money but that he had established a feed mill business at Baldwyn "and it is doing pretty good," and he thought it would do better, and would enable him to make payment on the note. He also said he had applied for a loan at a bank and the loan committee would shortly meet and he felt sure the loan would go through and he could then pay on the note.

On December 18, 1951, Caver wrote Morrison, attorney for Leval, saying "In your last letter you granted us some time to get the loan through and the reason I have waited this long to write was that I thought that the loan would be through by now  *  *  *," but that the loan committee had not passed upon the application. He then stated he "hoped you can hold off on it these few days again till the board does meet." He further said "I realize your position in this matter and thanks for being so nice to us on it  *  *  *."

Suit was not filed until January 9, 1953. Caver paid nothing whatever on the indebtedness.

As stated, Caver says he telephoned Standard Commission Company of Memphis he was not going to ship the third car of beans and was not going to fulfill his con-

tract, and Leval would have bought beans on the market, in which case Caver would have owed him the loss, if any, resulting from that procedure instead of owing the note here involved. The contention is untenable for a number of reasons. Standard Commission Company was not the agent of Leval for receiving any such notice. Standard was a broker. It brought about the original contract between Leval and Caver. As a matter of fact Caver paid Standard a brokerage fee of one and one-half cents per bushel on this contract. Leval never paid Standard anything whatever. Nor is it shown that any such notice was ever received by Leval. That notice was given, if given at all, in October 1950. All of the negotiations above detailed took place after that. They show conclusively that Caver was not relying upon this telephone conversation to release him or establish other obligations than the note. Besides that, Caver repeatedly said the reason he did not fulfill the contract was because the price of beans had gone up, although he also said that during October and November 1950, he could, and did, purchase soybeans for $2.07½ and $2.08½ per bushel, and resold them to others than Leval.

The other reason urged by Caver, as showing there was no consideration for execution of the note is his contention that the quantity of beans he was obligated to deliver to Leval was "approximately" 5,000 bushels. It is obvious at once that 3,666⅔ bushels in nowise "approximates" 5,000 bushels. In addition to that, Morrison testified that in his negotiations with Caver for settlement of this matter, both treated the quantity of beans bought under the contract as being 5,000 bushels. Caver never denied that. Further, Caver makes the unique admission that he never thought of that contention until after, or about the time, the suit was filed. We never had the idea in mind during the negotiations resulting in his execution of the note. ■■■ Thus, it is seen, Leval had a valid claim against Caver. Caver breached the contract. Leval had an immediate right of action for

breach of the original contract. In the settlement he forebore that right. He also made a material concession by settling on a price basis less than the market price of soybeans. And Caver was greatly benefitted by the settlement arrangement. On February 10, 1951, when the arrangement was made, he was then, and for sometime had been, liable to immediate suit for breach of the contract. The times of payment, under the note, were extended to $100.00 October 31, 1951; $100.00 November 30, 1951; $160.00 December 31, 1951; $100.00 October 31, 1952; $100.00 November 30, 1952, and $160.00 December 31, 1952. Here then we have both a valuable benefit to the promissor and a material detriment to the promisee. Those elements constituted ample consideration for execution of the note by Caver and its acceptance by Leval. Miller v. Bank, 131 Miss. 55, 95 So. 129; Stanley v. Sumrall, 167 Miss. 714, 147 So. 786; Martin v. Dixie Planing Mill, 199 Miss. 455, 24 So. 2d 332; Smaller War Plants Corporation v. Queen City Lumber Co., 200 Miss. 627, 27 So. 2d 531. In the Stanley case this Court said: ''That forbearance to assert a claim which might reasonably be doubtful is sufficient consideration to support a promise.'' The Court then set out a definition of a doubtful claim. However, as we have stated, Leval had a legal claim against Caver and it is not questioned that Leval was asserting the claim in good faith, and that he reasonably believed he had a fair chance of sustaining it in the courts.

The request of appellant for a directed verdict should have been sustained as to the principal and interest of the note, and judgment will be rendered here for those amounts. However, since the note provides for reasonable attorneys fee if placed in the hands of an attorney, and the amount of that fee has not been determined, the case will have to be remanded for that amount to be ascertained.

Reversed and judgment here for principal and interest of note sued on, and remanded for ascertainment of attorney fee.

*Hall, Kyle, Arrington* and *Gillespie, JJ.,* concur.